# NEW YORK SCAFFOLDING COMPANY *v.* LIEBEL–BINNEY CONSTRUCTION COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 22. Argued October 7, 8, 1920.—Decided November 8, 1920.

The court notices the earlier forms of scaffolding used in the construction of buildings. P. 26.

The fact that certain advantages over the prior art asserted for the patented device here in question were not asserted in the patent itself, *held* not to deprive the patent of their benefit in determining whether the device was an invention. P. 31.

Patent No. 959,008, claims 1 and 3, to Elias H. Henderson, for improvements in scaffold-supporting means, does not involve any invention over the prior art as displayed in the earlier patent to William J. Murray, but merely mechanical changes, easy to discern and to make, and incidental to the main idea of the Murray patent. Pp. 27–31.

243 Fed. Rep. 577, affirmed.

THE case is stated in the opinion.

*Mr. Frederick P. Fish*, with whom *Mr. C. P. Goepel, Mr. R. W. Hardie* and *Mr. F. C. Somes* were on the briefs, for petitioner.

*Mr. Wallace R. Lane* and *Mr. Robert H. Parkinson* for respondent.

MR. JUSTICE McKENNA delivered the opinion of the court.

Suit for infringement by the Construction Company of a patent dated May 24, 1910, and numbered 959,008, for new and useful improvements in "Scaffold-Supporting

Means," granted to Elias H. Henderson. Petitioner is assignee of the patent.

An injunction was prayed, accounting of profits and damages.

The patent is in the usual form, but a special manner of use of the invention is alleged. It is alleged that, since the acquisition of the patent, petitioner has been largely engaged in different cities of the United States in putting the invention into practice, and the manner thereof has been to construct and lease for use to builders and others at a specified royalty or price per week, the scaffolds embodying the invention, petitioner retaining the ownership of and title to the scaffolds, they being returned to petitioner upon the completion by the lessees of the work for which the scaffolds had been required.

The answer of the Construction Company directly put in issue certain of the allegations of the petition. It admitted, however, the use of scaffolds which it purchased from the Eclipse Scaffolding Company of Omaha, Nebraska, but alleged that such scaffolds did not contain or embody the invention protected by patent No. 959,008, in any way or manner.

It is also alleged that petitioner, sometime prior to February 21, 1914, brought suit in equity in the United States District Court for the District of Nebraska, against one Egbert Whitney, predecessor in the title of the Eclipse Scaffolding Company to the scaffolds sold by the latter company to the Construction Company, in which suit infringement of patent No. 959,008 was alleged.

In that suit a patent of one William J. Murray was pleaded, but the Scaffolding Company withdrew its case as to that patent and relied on claims 1 and 3 of the patent to Henderson, and the court decreed that the claims were void for want of invention, and it is alleged that the Construction Company "is entitled to the protection of said decree."

On the issues thus made by bill and answer proofs were taken and the court decreed against the patent, saying, in its opinion, that "the Henderson patent has not supplanted others, nor has the influence of its owner been exerted to that end. It barely represents a step in the art. It does not disclose invention." And further, "In view of the conclusion reached by this court that claims 1 and 3 of the patent in said suit are invalid, it is unnecessary to do more than touch upon the matter of infringement. The evidence of infringement is meagre, and yet, if the claims of patent in suit were to be held valid with a range of equivalents, infringement would be found." The decree was affirmed by the Circuit Court of Appeals. 243 Fed. Rep. 577.

The Construction Company pleaded in defense, as we have said, the decree of the District Court of Nebraska in the suit of petitioner against Egbert Whitney, but that decree was reversed by the Circuit Court of Appeals, 224 Fed. Rep. 452. The reversal and the opinion of the Circuit Court of Appeals thereon are much relied on in this suit, and we may say constituted the inducement to issue certiorari. It is seemingly antithetical to the opinion and judgment under review, and the Circuit Court of Appeals for the Third Circuit felt and expressed the embarrassment of "disturbing the force of a decision of a court of coördinate jurisdiction," formed "upon precisely the same issues and upon substantially the same facts." The court, however, felt constrained to an "opposite judgment" and decided that Henderson made but "formal changes" in the prior art which involved no invention, and affirmed the decree of the District Court.

Necessarily, for an estimate of Henderson's patent we must consider the prior art. It is detailed by witnesses, explained by counsel, and illustrated. Specific descriptions are not necessary. We may refer to our own observation of the first forms of scaffolding. To quote

District Judge Orr, "Originally, scaffolding was made to rest upon the ground and was increased in height as the building of the structure demanded." The first forms of scaffolding which constituted the prior art are described by a witness as "the thrust out scaffold, the pull scaffold, the timber scaffold; that they were built right up to the front of the building." In 1900, he testified, "a new device came on the market, or a new structure, and, in place of building up from the ground, they hung a rigid iron frame from the upper stories of the building. That could be used on three or four stories sometimes. It was heavy, inconvenient to handle, and did not meet with very great success, although it did seem to be an improvement over the old poles. Then there came another form of scaffolding, which was a suspended wire platform scaffold, suspending the wires from the top of the building. . . . Then there came the Cavanagh overhead scaffolding machine. . . . That machine became fairly well used, after being introduced, and was apparently a great improvement over any other. Then Murray came in the market with his platform machine; a machine operated from the platform, the fastening of the wire that supported the platform being from above, the wire being secured to the out-riggers from the upper part of the building. Then the Henderson machine, supported by cables from the upper part of the building, and similar in a great many respects, except that the machines were placed in the opposite position, enabling you to make a scaffold of any width, which would seem to be the latest."

The Murray patent, therefore, is the step in the prior art preceding that made by Henderson and a comparison of the latter's patent with it, the Murray patent, is immediately indicated.

Murray describes his invention to be of "new and useful Improvements in Adjustable Scaffolds." The object of it, he said, was to provide such a scaffold as would

"permit of adjustment at any height during the construc-
tion of a building or the repair thereof." And he claimed,
"The combination with two bars having means for de-
tachably securing them to a building, of a platform, frames
on said platform carrying means operable from the plat-
form and having connections adapted to be connected
to one of said bars for raising the platform, and support-
ing means on said frames extending above the said bar
when the platform has been fully raised and adapted to
detachably engage said bar and rigidly support the plat-
form therefrom, whereby, the platform may be connected
to one bar by the raising means and raised to a level to
engage the supporting means with said bar and may then
remain supported by said bar while the other bar is placed
at a higher level and the raising means secured to the
latter, the bars thus becoming alternately points of rais-
ing support and of rigid support for the platforms."

On page 29 is the illustrative diagram of the claim.

Henderson describes his invention as "certain new and
Improved Scaffold-Supporting Means," and further says
it relates "to an improved means for supporting scaffolds
used in connection with the construction of buildings and
their repair." In other words, the patent is, as the Murray
patent is, for improvement of scaffold supporting means.
And the details given by Murray, or necessarily implied
by him, and the inevitable adjuncts "of cross beam and
floor piece" are made elements in the combinations
claimed in three claims. There is a change from the
Murray hoisting device and it is described to consist
"of a continuous U-shaped metal bar extending around
the under side of and upward from the associated
beam, . . ." The continuity of metal is the novel
element asserted. Counsel emphasize it, not so much
for itself as for what it permits. It permits according to
counsel, a "hinged or loose jointed connection between
the putlog [called in the claims "cross beams"] and the

frames that support the putlog and the hoisting mechanism," and counsel say that this is a "separate and distinct entity from the elements of the Murray patent, differing in structure, function and result produced." And of this it is insisted there was no suggestion in the Murray patent, it containing but a single claim and a

*Fig 2*

single idea, "the idea of supporting the scaffold to outriggers by means of auxiliary bars or rods," so that the platform or scaffold by the lengthening of the cables can be raised to a greater height than before. In other words, the assertion is that Murray invented nothing and saw nothing in his device but means of raising the scaffold, and, to use counsel's word, all other "functions" were

beyond his vision. Or again, and to bring out clearly
counsel's contention, "Henderson did not do what Mur-
ray did. Murray provided means for supporting a plat-
form temporarily on one set of outriggers while the cables
were being adjusted to a higher set of outriggers. That
is all Murray did, and that was embodied in the one claim
of the patent and that is what Henderson did not do.
Murray, on the other hand, never suggested the idea of
making a hinged or flexible connection between the put-
logs' and their supporting frames." The utility of this
construction is the final assertion, and that the continuity
of metal of the stirrup adds strength, and the loose jointed
connection of the putlogs with it gives "flexibility longi-
tudinally and also transversely of the platform" and "en-
ables the operator to raise the scaffold machines one at a
time, allowing the putlogs to tip or hinge over the support
of the U-frame, leaving the machine to stand erect at all
times." The advantage of this is emphasized in various
ways and the construction, it is insisted, quoting the
patent, "secures the greatest possible amount of security."

Claims 1 and 3 are inserted in the margin.[1] The fol-
lowing is an illustration of them taken from brief of coun-
sel. [See p. 31].

It is further contended that the arrangment of the hoist-
ing device parallel to a building, instead of at right angles

[1] "1. A scaffold consisting in the combination of cross beams, floor
pieces extending between such beams, and a hoisting device associated
with each end of each beam, each hoisting device consisting of a con-
tinuous U-shaped metal bar extending around the under side of and
upward from the associated beam, and a hoisting drum rotatably sup-
ported by the side members of such bar."

"3. A scaffold consisting of a plurality of U-shaped bars arranged in
pairs, a cross beam laid in and extending between each pair of such
U-shaped bars, a floor laid upon said cross beam, a drum rotatably
supported between the upwardly extending side members of each of
said U-shaped bars, and means for controlling the rotation of said
drum."

to it as in the Murray patent, gives more room to the working masons and mechanics, and contributes therefore to their security. This advantage was asserted in the patent, the others were not, nor displayed or counted on. They, however, may be conceded. The fact of non-display in the patent, while it does not militate against his claims for the advantages, causes surprise at least, considering the emphasis that is now put upon them and the assertion that they distinguish and make superior his mechan-

isms to all that preceded them. However, we may concede to counsel, for the sake of the argument, all of the uses and excellences of the patent, even though not discerned by Henderson, but his pretensions, whether at first hand or second, his or those of his counsel, must be subjected to the test and estimate of the prior art and so subjecting them we can discern no exercise of invention. The changes were simply mechanical, easy to discern, and as easy to make, incidental entirely to the main idea of Murray which was, as was declared by him, to provide a scaffold that would "permit of adjustment at any height during the construction of a building or the repair thereof" —a scaffold which might "be readily moved from one

position to another by the workmen thereon without interfering materially with the work being performed," and one "in which different supports are employed," and "in which the shifting from one set of supports to another set," might "be accomplished without interfering, in any degree, with the workmen thereon or their work." A glance at the diagram which we have given will show that he accomplished his purpose and the way he accomplished it; a glance at the diagram we have given of the Henderson device will show that it is a substantial imitation of Murray's scaffold, the variations being only mechanical. The chief difficulty we have found in the case is the plausibility of the arguments of counsel, and that it secured the assent of the Circuit Court of Appeals for the Eighth Circuit and other courts and strength from such assent.

*Decree affirmed.*